IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DEBORAH WOOD MORTON,                  :
                                      :
      Plaintiff,                      :
                                      :
vs.                                   :
                                      :      CIVIL ACTION 13-0090-M
CAROLYN W. COLVIN,                    :
Commission of Social Security,        :
                                      :
      Defendant.                      :


MEMORANDUM OPINION AND ORDER


    In this action under 42 U.S.C. § 405(g), Plaintiff seeks

judicial review of an adverse social security ruling which

denied a claim for disability insurance benefits (Docs. 1, 10).

The parties filed written consent and this action has been

referred to the undersigned Magistrate Judge to conduct all

proceedings and order the entry of judgment in accordance with

28 U.S.C. § 636(c) and Fed.R.Civ.P. 73 (*see* Doc. 17).   Oral

argument was waived in this action (Doc 15).   Upon consideration

of the administrative record and the memoranda of the parties,

it is **ORDERED** that the decision of the Commissioner be **AFFIRMED**

and that this action be **DISMISSED**.

    This Court is not free to reweigh the evidence or

substitute its judgment for that of the Secretary of Health and

Human Services, *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th

1

Cir. 1983), which must be supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The substantial evidence test requires "that the decision under review be supported by evidence sufficient to justify a reasoning mind in accepting it; it is more than a scintilla, but less than a preponderance." *Brady v. Heckler*, 724 F.2d 914, 918 (11th Cir. 1984), *quoting Jones v. Schweiker*, 551 F.Supp. 205 (D. Md. 1982).

At the time of the administrative hearing, Plaintiff was fifty-two years old, had completed a high school education[1] (Tr. 46), and had previous work experience as an apartment manager and leasing agent (Tr. 43, 51). In claiming benefits, Plaintiff alleges disability due to degenerative disc disease of the lumbar spine with stenosis, migraine headaches, neuropathy, and hip pain (Doc. 10 Fact Sheet).

The Plaintiff filed an application for disability benefits on January 27, 2009, asserting a disability date of June 1, 2008 (Tr. 119-20; *see also* Tr. 24). Benefits were denied following a hearing by an Administrative Law Judge (ALJ) who determined that Morton was capable of performing her past relevant work as a customer service representative and claims processor as well as other named sedentary work positions (Tr. 24-33). Plaintiff

---

[1] **Error! Main Document Only.**Plaintiff testified that she had received a Graduate Equivalency Degree (Tr. 46).

requested review of the hearing decision (Tr. 19-20) by the
Appeals Council, but it was denied (Tr. 1-5).

Plaintiff claims that the opinion of the ALJ is not
supported by substantial evidence. Specifically, Morton alleges
that: (1) The ALJ did not properly evaluate her complaints of
pain and improperly discounted her testimony; and (2) the ALJ's
opinion was based on unreliable testimony from the vocational
expert (hereinafter *VE*) (Doc. 10). Defendant has responded to—
and denies—these claims (Doc. 12).

The relevant evidence of record follows.[2]

On June 11, 2008, Dr. Carter E. Slappey, with Orthopaedic
Specialists of Alabama, examined Plaintiff for complaints of
persistent pain in her lower back, bilateral buttock, and leg
with tingling and numbness; x-rays of the lumbar spine showed
some mild multilevel spondylitic changes (Tr. 263). Lortab was
prescribed.[3] On June 23, MRI results showed mild multilevel
degenerative changes, "some posterior disc bulging and mild
facet arthropathy but very little, if any, significant
stenosis;" Morton underwent an epidural (Tr. 262; *see also* Tr.
260). On July 14, Plaintiff reported that she was doing better

---

[2]Any evidence that pre-dates June 1, 2008, Morton's alleged
disability date, or that does not specifically relate to the claims
raised, will not be reviewed herein (*see, e.g.*, Tr. 207-58).

[3]**Error! Main Document Only.***Lortab* is a semisynthetic narcotic
analgesic used for "the relief of moderate to moderately severe pain."
*Physician's Desk Reference* 2926-27 (52nd ed. 1998).

but still had some pain; Slappey recommended physical therapy and noted that she had Darvocet[4] for pain (Tr. 261).

On June 30, 2008, Morton was seen at The Baptist Health Center in Bessemer for a headache, chest pain, and muscle spasms; she felt better after an epidural was administered by Dr. Slappey (Tr. 302; *see also* Tr. 296-327).  Fiorinal[5] and Phenergan[6] were prescribed.  On December 8, Morton's migraine headache was noted to be stable, but she had lower back pain; Percocet[7] and Soma[8] were prescribed (Tr. 300).  On January 8, 2009, Plaintiff complained of a headache and low back pain for the past month; she was noted to have pain on movement of the lower back (Tr. 299).  On February 3, Morton reported a seven-day migraine and appeared to be in pain (Tr. 298).  On February 24, Plaintiff complained of upper back and chest pain because of a fall; migraines were considered stable (Tr. 297).  On March

---

[4]**Error! Main Document Only.**Propoxyphene napsylate, more commonly known as Darvocet, is a class four narcotic used "for the relief of mild to moderate pain" and commonly causes dizziness and sedation. *Physician's Desk Reference* 1443-44 (52nd ed. 1998).

[5]**Error! Main Document Only.***Fiorinal* is used for relieving tension (or muscle contraction) headaches.  *Physician's Desk Reference* 1855-57 (52nd ed. 1998).

[6]**Error! Main Document Only.***Phenergan* is used as a light sedative. *Physician's Desk Reference* 3100-01 (52nd ed. 1998).

[7]*Percocet*  is used for the relief of moderate to moderately severe pain.  **Error! Main Document Only.***Physician's Desk Reference* 1125-28 (62nd ed. 2008).

[8]**Error! Main Document Only.***Soma* is a muscle relaxer used "for the relief of discomfort associated with acute, painful musculoskeletal conditions," the effects of which last four-to-six hours.  *Physician's Desk Reference* 2968 (52nd ed. 1998).

10, she still had back pain for which Topomax[9] was prescribed.

On August 28, 2008, Morton was seen for a migraine headache at South Baldwin Medical Center for which she was given Toradol;[10] she was discharged with a pain level of three on a ten-point scale (Tr. 562-74; *see generally* Tr. 561-81).

Morton was seen at the Princeton Baptist Hospital on March 2 and 8, 2009 for severe back pain for which she was given Dilaudid[11] (Tr. 500-18; *see generally* Tr. 500-528). An abdominal ultrasound and CT of the chest, without contrast, revealed no abnormalities.

On June 2, 2009, Dr. James J. Matic examined Morton and noted that the spine looked normal and that she had full range of motion (hereinafter *ROM*) in both the cervical and lumbar spine (Tr. 344-45). There was normal ROM in all extremities; grip strength was 4/5 in both hands. Plaintiff could squat and rise. Dr. Matic characterized the exam as unremarkable.

On July 16, 2009, Plaintiff underwent a bilateral lumbar foraminotomy at L4-5 for lateral recess decompression as well as a discectomy at L4-5 bilaterally at St. Vincents Hospital by Dr. Samuel R. Bowen, II (Tr. 537-53). On September 24, an MRI

---

[9]*Topomax* is used in the treatment of migraine headaches. **Error! Main Document Only.***Physician's Desk Reference* 2378-79 (62nd ed. 2008).

[10]*Toradol* is prescribed for short term (five days or less) management of moderately severe acute pain that requires analgesia at the opioid level. *Physician's Desk Reference* 2507-10 (52nd ed. 1998).

[11]*Dilaudid* is used for the management of pain. **Error! Main Document Only.***Physician's Desk Reference* 419-22 (62nd ed. 2008).

showed some diffuse disc bulging at L4-5, but no evidence of disc herniation (Tr. 532; *see generally* Tr. 530-36).

Bone density tests performed in October 2009 demonstrated osteoporosis for which medication was given (Tr. 369; *see also* Tr. 367, 376).

Morton was seen twice at the Coastal Neurology Institute by Dr. Edward R. Flotte during the period of a week in November 2009 for complaints of lumbar spine pain, radiating into both legs (Tr. 555-60). In the first examination, Plaintiff had normal posture and gait and full ROM in all joints though there was multidermatomal numbness; the doctor indicated that she had a herniated lumbar disc. On the second visit, following an MRI, Flotte changed his diagnosis to significant degenerative disc disease of the lumbar spine and spondylosis, with no neural compression.

Records from Dr. J. Steven Hankins, Doctor of Osteopathy at the Coastal Health Occupational Pain Management, show that he treated Plaintiff from November 23, 2009 through July 19, 2010 (Tr. 410-98). Morton's initial complaint was constant lumbar pain down both legs into her feet, described as stabbing like pins and needles and burning with numbness, rated as seven on a ten-point scale (Tr. 410). The doctor noted that movement of the lower back caused pain and that ROM was abnormal though sensation in the lower extremities was normal; the straight leg

raise test was negative bilaterally (Tr. 411).  There was spasm in the paraspinous muscles; squatting and heel/toe standing and walking could not be performed.  Strength testing in the lower extremities was 5/5 in all muscle groups.  Deep tendon reflexes were +2/4 and bilaterally symmetric for upper and lower extremities (Tr. 412).  Dr. Hankins prescribed Lortab, Robaxin,[12] Mobic,[13] and Lyrica.[14]  On December 7, 2009, it was noted that Plaintiff walked with a limp and had limitation of motion in the hips; paraspinal muscles were tender with limited ROM (Tr. 414).  Morton underwent an injection in the left trochanteric bursa and was encouraged to engage in stretching exercises (Tr. 415).  Plaintiff had three therapy treatments over the next three weeks that consisted of manual therapy, electric stimulation, and performing of therapeutic exercise (Tr. 417-21).  On January 5, 2010, Plaintiff stated that her pain was getting better; cervical spine movement caused no pain though ROM was abnormal (Tr. 422-24).  There was tenderness, but upper and lower extremity strength was 5/5 (Tr. 423).  Lumbar spine movement caused pain and ROM was abnormal; squatting and heel/toe walking

---

[12]**Error! Main Document Only.***Robaxin* "is indicated as an adjunct to rest, physical therapy, and other measures for the relief of discomforts associated with acute, painful musculoskeletal conditions."  *Physician's Desk Reference* 2428 (52nd ed. 1998).

[13]**Error! Main Document Only.***Mobic* is a nonsteroidal anti-inflammatory drug used for the relief of signs and symptoms of osteoarthritis and rheumatoid arthritis.  *Physician's Desk Reference* 855-57 (62nd ed. 2008).

[14]*Lyrica* is used for the management of neuropathic pain.  **Error! Main Document Only.***Physician's Desk Reference* 2517 (62nd ed. 2008).

and standing were performed. Oxycodone[15] was prescribed. There were five treatments over the next month (Tr. 425-34) before Morton was examined by Osteopath Hankins whose examination results were, essentially, the same as the previous one (Tr. 435-38). After three more treatment sessions (Tr. 439-45), the doctor noted that hip movement caused pain and ROM was abnormal; sensation was normal and Trendelenburg's test for hip instability was negative (Tr. 446-48). Following five treatments (Tr. 449-57), Morton was examined on March 29, 2010 by Dr. Hankins who noted that a recent MRI revealed no significant changes of the lumbar spine; though cervical spine movement caused some pain, the same was not true for the lumbar spine (Tr. 458-61). There was full strength in all muscle groups with no tenderness; noting that Plaintiff had a headache, the doctor stated that she had been undergoing acupuncture and was being fitted for a TENS unit. Morton underwent two additional treatments (Tr. 462-65) before seeing the Osteopath again who noted no substantive changes from the prior exam (Tr. 466-69). Three treatment sessions later (Tr. 471-76), Hankins, on May 24, noted no changes (Tr. 477-79). Nine days later, Osteopath Matthew Barfield examined Morton for complaints of constant falling; on examination, the lumbar spine had some mild

---

[15]**Error! Main Document Only.**_Oxycodone_ is a pure agonist opioid with a principal therapeutic action of analgesia. _Physician's Desk Reference_ 2680-81 (62nd ed. 2008).

tenderness and decreased ROM in flexion and extension (Tr. 486-88).  There was full ROM throughout the lower extremities; he suggested electrodiagnostic testing to assess neural involvement.  On June 21, 2010, Dr. Hankins noted pain with lumbar back movement; zanaflax[16] was prescribed (Tr. 489-91). Morton had two more treatment sessions (Tr. 492-95) followed by an exam, on July 19, 2010, by Hankins's professional assistant who noted no physical changes (Tr. 496-98); Plaintiff was discharged at that time for noncompliance.

On March 18, 2010, Plaintiff was seen at Thomas Hospital for a headache, nausea, and vomiting for which she was given Demerol[17] and Phenergan[18] injections (Tr. 593-98).  Morton was admitted overnight on August 2, 2010 for a migraine; a CT scan of her head was negative (Tr. 585-92).  She was discharged following injections of Toradol, Phenergan, and Dilaudid.

On June 29, 2010, Dr. George C. Graves examined Morton for daily migraines; it was noted that although she had been diagnosed with sleep apnea, which exacerbated her headaches, she was not compliant with the treatment (Tr. 357-59).  The doctor found Plaintiff in no acute distress, with no swollen or

---

[16]**Error! Main Document Only.***Zanaflax* "is a short-acting drug for the acute and intermittent management of increased muscle tone associated with spasticity."  *Physician's Desk Reference* 3204 (52nd ed. 1998).

[17]**Error! Main Document Only.***Demerol* is a narcotic analgesic used for the relief of moderate to severe pain.  *Physician's Desk Reference* 2570-72 (52nd ed. 1998).

[18]**Error! Main Document Only.***Phenergan* is used as a light sedative. *Physician's Desk Reference* 3100-01 (52nd ed. 1998).

inflamed joints, but with full motor strength in all muscle groups bilaterally; Graves noted that she was self-limiting in using her lower extremity. The doctor increased her Topomax prescription strength and told her to restart sleep apnea treatment. On July 12, Plaintiff was still experiencing the migraines in spite of using her CPAP; Graves noted that she was still using barbiturate drugs, formerly prescribed, though instructed not to do so at the previous exam (Tr. 354-56). Lyrica was prescribed for her to use instead. On August 19, Morton said that she had tingling in her hands and a buzzing feeling in her thighs, but otherwise felt great; Dr. Graves noted no sensory deficits though her gait was unsteady (Tr. 351-53). Plaintiff was to continue her medications and return in six months.

On October 19, 2010, Dr. Jacob Greuel examined Morton who complained of chills, fatigue, and low-grade fever (Tr. 392-94). Plaintiff was in no acute distress with normal gait and no neurological deficits noted; the doctor refilled prescriptions for Fiorinal and Xanax[19]. On December 13, Morton was treated for an upper respiratory infection (Tr. 389-91). Two weeks later, she was still suffering from chronic maxillary sinusitis (Tr. 386-88). On January 5, 2011, Plaintiff was examined for

---

[19] **Error! Main Document Only.***Xanax* is a class four narcotic used for the management of anxiety disorders. *Physician's Desk Reference* 2294 (52nd ed. 1998).

continued sinusitis and hyperlipidemia (Tr. 383-85).

On October 28, 2010, Plaintiff was examined by Dr. Ron Lee, at Gulf Coast Occupational, Sports and Pain Medicine, who found full motor strength and ROM in the upper and lower extremities; there were no trigger points, though Morton was characterized as stiff (Tr. 611; *see generally* Tr. 611-15). Nevertheless, the doctor's impression was chronic lumbar and cervical pain due to degenerative disc disease for which Mobic,[20] Lyrica, Flexeril, and Lortab were prescribed. On November 22, the doctor noted that Plaintiff's pain was improved, rated as three on a ten-point scale (Tr. 614). On December 20, though, the pain was worse (Tr. 613). A CT scan of the lumbar spine on December 22 demonstrated disc herniation at L3-L4 and L4-L5 with the greatest degree of spinal stenosis at the L4-L5 level; there also appeared to "be a fracture of the inferior aspect of the facet complex L4 bilaterally which appears old due to the increased sclerosis" (Tr. 615). On January 17, 2011, the pain was considered stable and improved and rated at a level of two; there was no change in the diagnosis or treatment (Tr. 612).

On January 18, 2011, Morton was examined by Dr. J. Clay Rainer for low back pain who noted that a CT scan from a month

---

[20]**Error! Main Document Only.***Mobic* is a nonsteroidal anti-inflammatory drug used for the relief of signs and symptoms of osteoarthritis and rheumatoid arthritis. *Physician's Desk Reference* 855-57 (62nd ed. 2008).

earlier, as well as prior MRI's, revealed "significant degenerative disc disease with stenosis at L4-5 and L5-S1 related to facet hypertrophy;" Dr. Rainer noted that Morton used a lumbar support orthosis (Tr. 404; *see generally* Tr. 404-08). During the examination, the Orthopedic physician noted that Plaintiff was a

> [w]ell developed female sitting up independently in no apparent distress.  She is alert and cooperative.  She stands fluidly from a low seated position.  She has trouble bending forward, only touching her knees and standing back up slowly.  She is exquisitely tender over the left lower lumbar facets and tender over the right L4-5 facets.  She has positive bilateral facet loading, much worse on the left.  She exhibits full strength of both lower extremities with pain against active resistance to hip flexion.  She has decreased light touch sensation in the bilateral L3 distribution, otherwise normal sensation.  Reflexes are 1+ and equal in the bilateral patella and Achilles.  She has negative bilateral Patrick's.

(Tr. 405).  Rainer scheduled epidural blocks, increased her Lyrica prescription, and prescribed Percocet.  On February 15, 2011, Dr. Rainer noted that Morton reported that the blocks helped relieve her pain, though not completely; she noted additional complaints of arm numbness and tingling on occasion and new, persistent, mid-back burning pain (Tr. 617; *see generally* Tr. 617-24).  On examination, Dr. Rainer noted full

ROM of the neck and upper extremities; she was tender around the T11-12 paraspinals, worse on the left and over the bilateral lower lumbar facets with positive left facet loading. The doctor also noted some arm and upper back symptoms consistent with cervical and thoracic sprain/strain; Rainer scheduled Plaintiff for radiofrequency ablation. On March 8, 2011, Morton complained of more pain since the ablation procedure, especially in her tailbone; she also reported pain radiating down her leg that she thought was new and caused by the procedure (Tr. 621-22). Rainer noted that she was in no apparent distress and stood fluidly from a low-seated position; Morgan had tenderness over the left L5-S1, though she had good strength of both lower extremities. On March 15, Plaintiff had an epidural, causing a lot of pain (Tr. 623).

At the evidentiary hearing, Morton testified that she last worked in April 2008 as an apartment manager and that she was laid off because the business did not need her any more (Tr. 43-59). She has a driver's license and could drive but did not because her medication made her dizzy. Plaintiff had a spine fracture and could stand for only ten minutes without suffering excruciating pain; her doctor did not want her to use a cane or walker as that would weaken her leg muscles. Morton underwent a laminectomy in June 2009, and after that, she could not take care of herself or work anymore. In the prior nine weeks,

Morton had had four blocks, two epidurals, and a nerve ablation; she was about to have another block and be examined by a neurosurgeon for surgery because she kept falling down. Morton lies around most of the day because of the pain; physical therapy and pain management did not help. Plaintiff could do a little cooking and cleaning. Movement caused her pain. She could walk fifteen feet, sit five minutes, and stand for ten minutes; she could not stoop, squat, kneel, crawl, and could lift only ten pounds. Morton fell down about every two weeks and had migraines daily, sometimes lasting as long as a month.

In the administrative decision, the ALJ summarized the record medical evidence before determining that Morton could perform past relevant work as a customer service representative and claims processor as well as other named sedentary work positions (Tr. 24-33). In reaching this decision, she discounted Morgan's testimony as non-credible and summarized the VE's testimony, adopting her conclusions as her own. This concludes the Court's summary of the evidence.

In bringing this action, Morton first asserts that the ALJ did not properly evaluate her complaints of pain. She has more generally asserted that the ALJ improperly discounted her testimony (Doc. 10, pp. 3-10). The standard by which the Plaintiff's complaints of pain are to be evaluated requires "(1) evidence of an underlying medical condition and either (2)

objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citing *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986)). The Eleventh Circuit Court of Appeals has also held that the determination of whether objective medical impairments could reasonably be expected to produce the pain was a factual question to be made by the Secretary and, therefore, "subject only to limited review in the courts to ensure that the finding is supported by substantial evidence." *Hand v. Heckler*, 761 F.2d 1545, 1549 (11th Cir.), *vacated for rehearing en banc*, 774 F.2d 428 (1985), *reinstated sub nom. Hand v. Bowen*, 793 F.2d 275 (11th Cir. 1986). Furthermore, the Social Security regulations specifically state the following:

> statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory

> findings), would lead to a conclusion that
> you are disabled.

20 C.F.R. 404.1529(a) (2013).

In her decision, the ALJ found that although Morton's impairments could be expected to cause symptoms of pain and limitation, her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible" (Tr. 29). The ALJ explained this conclusion by first noting that Plaintiff quit working because she was laid off—not because she could not work. As Morton stated in her testimony at the evidentiary hearing, the company for which she was working did not need her any more (Tr. 43). The Court notes that Plaintiff went on to testify that it was following her laminectomy in June 2009 that she could no longer take care of herself or work (Tr. 53-54). This was not just a simple mix-up of dates as the surgery actually occurred in July 2009 (Tr. 537-53) though Morton first sought benefits as of June 1, 2008 (Tr. 119), thirteen months before her surgery.

The ALJ also challenged Morton's credibility because of testimony she gave at the hearing that she had never worked for a particular business, Gravy Train, even though she submitted information to the Social Security Administration (hereinafter SSA) that provided information about that job (Tr. 30; *cf.* Tr.

16

44-45, 181).[21]

The ALJ offered further reasons for rejecting Morton's assertions of pain and limitation, stated specifically:

> The claimant's alleged activities of daily living have also varied in the record. While at the hearing, she stated she does not go out due to fear of falling or drive much, in her function report, she stated she drives herself to shop for 1-2 hours at a time, twice a week. (Ex. 4E). She goes to church regularly. (*Id.*). If she feels good, she goes out every day. (*Id.*). She also typically washes her clothes and does the dishes. (*Id.*). In the same report, did not apparently agree that she was incapable of working—she instead said she could no longer "work [a] 10-12 hr. day job" and acknowledged her work for Gravy Train. (*Id.*). Further, her claim that she can only walk 15 feet or a block conflicts with her statement to Dr. Flotte, her neurologist, that she exercises 5-6 times per week by walking. (Ex. 21F/2; Hearing; Ex. 3E). Despite alleging frequent falls, the claimant does not use any assistive device such as a cane or walker. (Ex. 4E; Hearing). While claiming to only be able to sit for 5 minutes without feeling uncomfortable, I did not notice the claimant changing postures frequently or getting up during the hearing, and the claimant did not take any breaks.
>
> The claimant's description of her activities seem to fit better with how she is on her worst days, than how she is on a typical day. In fact, the record indicates many of her symptoms are improved with conservative treatment such as heating pads

---

[21]The Court did not include this information in its summary of the evidence, finding that this brief discussion of it was sufficient.

and migraine medications.  (Hearing).[22]  As
noted above, objective signs (such as
diminished range of motion and pain levels"
have improved during the alleged disability
period.  No doctor has submitted a statement
supporting her disability claim, or even
offered an assessment of the claimant's
occupational limitations.  Although none of
these credibility factors is individually
dispositive, in combination, they suggest
that the limiting affects of the claimant's
symptoms are not as severe as alleged.

(Tr. 30) (footnote in original).

The Court finds substantial support for the ALJ's
conclusions.  The Court notes that there were several instances
where Plaintiff's doctors found her non-compliant with their
treatment regimen which consisted almost entirely of taking
medications.  Furthermore, Morton's statements to her doctors
and to the ALJ conflict with her doctors' findings.  As noted by
the ALJ, no treating source suggested that Plaintiff was unable
to work or limited her in any fashion.  In one of her last
medical examinations of record, her treating physician, Dr. Lee,
rated her pain at two on a level of ten (Tr. 612); two visits
and two months earlier, Dr. Lee found Morton's pain to be only
three of ten (Tr. 614).  The Court finds no merit in Plaintiff's
assertions that the ALJ did not properly consider her pain and

---

[22]At her consultative examination, the claimant alleged having
severe, frequent and incapacitating migraines for over 30 years.  (Ex.
11F).  Despite this long-lasting condition, she has held jobs
throughout most of the last 30 years.  (Exs. 2D; 3E).  She did not
quit her last full-time job due to her migraines or other impairments.
(Hearing).

limitations.

Morton next claims that the ALJ's opinion was based on unreliable testimony from the VE. More specifically, Plaintiff argues that she did not earn enough or perform the two past jobs that the VE found that she was capable of still performing for a long enough period of time for them to qualify as past relevant work (Doc. 10, pp. 11-16). This claim is based on the jobs of customer service representative and claims processor (Tr. 31).

The Court notes that Plaintiff has the burden of proving that she cannot perform her past relevant work. *Macia v. Bowen*, 829 F.2d 1009, 1012 (11th Cir. 1987) (*citing Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985)). Past relevant work is defined as "work that [a claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." 20 C.F.R. § 404.1560(b)(1) (2013).

In her Work History Report, submitted to the SSA, Morton stated that she performed customer service work from March through September 2007 (Tr. 145). She was paid nine dollars per hour for forty hours a week, and earned a total of $5,905.45 (Tr. 129). Over that seven-month period, she averaged $843.63 per month; this is more than the minimum of $780 per month required for substantial gainful activity (hereinafter SGA) under the SSA regulations for the year 2002. *See*

https://secure.ssa.gov/poms.nsf/lnx/0410501015. According to the Dictionary of Occupational Titles (hereinafter *DOT*), this job classification has a specific vocational preparation time of six months and up to, and including, one year to learn how to perform (*see* http://www.occupationalinfo.org/24/241367014.html; *see also* Tr. 66). For this reason, the Government concedes that Morton likely did not perform the job long enough to have learned to do it (Doc. 12, p. 11 n.4).

However, according to her Work History Report, Morton also worked as an insurance claims processor from October 2002 through April 2003 (Tr. 145). Morton earned $2615.81 over the three-month period of 2002 (Tr. 127), an average of $871.93, more than the $780 minimum SGA requirement. Over the four-month period of 2003, Morton earned $6,757.75 (Tr. 128), an average of $1689.43, more than the $800 monthly minimum required for SGA. *See* https://secure.ssa.gov/poms.nsf/lnx/0410501015. According to the DOT, it would take three to six months to learn how to do the job (*see* http://www.occupationalinfo.org/24/241362010.html; *see also* Tr. 66). As Plaintiff worked there for seven months, the Court finds that she was there long enough to learn how to perform it.

The evidence shows that Morton's work as an insurance claims processor was performed within the previous fifteen years, for a period long enough to learn how to do it, and

qualified as substantial gainful activity. As such, Morton has not shown that she could not return to her previous relevant work as an insurance claims processor. As it was Plaintiff's burden to prove that she could not return to her past relevant work, her claim that the ALJ improperly relied on the VE's testimony to reach her decision is without merit.[23]

Morton raised two different claims in bringing this action. Both are without merit. Upon consideration of the entire record, the Court finds "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 401. Therefore, it is **ORDERED** that the Secretary's decision be **AFFIRMED**, *see Fortenberry v. Harris*, 612 F.2d 947, 950 (5th Cir. 1980), and that this action be **DISMISSED.** Judgment will be entered by separate Order.

DONE this 1st day of November, 2013.


                              s/BERT W. MILLING, JR.
                              UNITED STATES MAGISTRATE JUDGE

---

[23]It is, at most, harmless error that the ALJ found that Plaintiff could perform her customer service work as the ALJ has correctly shown that she can perform the job of insurance claims processor.